**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRADLEY PHILLIPS, Derivatively on Behalf of Nominal Defendant COGENT COMMUNICATIONS HOLDINGS, INC.,<br><br>16183 N 61st Way,<br>Scottsdale, Arizona 85254<br><br>Plaintiff,<br><br>v.<br><br>DAVID SCHAEFFER<br>c/o Cogent Communications Holdings, Inc.<br>Reg. Agent: Corporation Service Company<br>2450 N Street, NW<br>Washington, D.C. 20037<br><br>THADDEUS G. WEED<br>c/o Cogent Communications Holdings, Inc.<br>Reg. Agent: Corporation Service Company<br>2450 N Street, NW<br>Washington, D.C. 20037<br><br>PAUL DE SA<br>c/o Cogent Communications Holdings, Inc.<br>Reg. Agent: Corporation Service Company<br>2450 N Street, NW<br>Washington, D.C. 20037<br><br>STEVEN D. BROOKS<br>c/o Cogent Communications Holdings, Inc.<br>Reg. Agent: Corporation Service Company<br>2450 N Street, NW<br>Washington, D.C. 20037<br><br>SHERYL KENNEDY<br>c/o Cogent Communications Holdings, Inc.<br>Reg. Agent: Corporation Service Company<br>2450 N Street, NW<br>Washington, D.C. 20037<br><br>MARC MONTAGNER<br>c/o Cogent Communications Holdings, Inc. | Case No. _______________<br><br>JURY TRIAL DEMANDED |

Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

LEWIS H. FERGUSON III
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

DENEEN HOWELL
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

EVE HOWARD
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

and

DAVID BLAKE BATH
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

Defendants,

and

COGENT COMMUNICATIONS HOLDINGS, INC.,
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

Nominal Defendant.

# VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Bradley Phillips ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Cogent Communications Holdings, Inc. ("Cogent" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) Defendants' publicly available documents, conference call transcripts and announcements made by Defendants; (ii) United States Securities and Exchange Commission ("SEC") filings; (iii) press releases published by and regarding Cogent; (iv) legal filings; (v) news reports; (vi) securities analysts' reports about the Company; (vii) filings in the related securities class action captioned *City of Southfield Fire and Police Retirement System v. Cogent Communications Holdings, Inc., et al.*, Case No. 1:26-cv-02609 (D.D.C.) (the "Securities Class Action"); and (viii) other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Cogent against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[1] for, *inter alia,* breaches of their fiduciary duties between at least February 29, 2024,

[1] Individual Defendants are David Schaeffer ("Schaeffer"), Thaddeus G. Weed ("Weed"), Paul de Sa ("de Sa"), Steven D. Brooks ("Brooks"), Sheryl Kennedy ("Kennedy"), Marc Montagner ("Montagner"), Lewis H. Ferguson III ("Ferguson"), Deneen Howell ("Howell"), Eve Howard ("Howard"), and David Blake Bath ("Bath"). The Individual Defendants, together with Cogent, are "Defendants."

and May 1, 2026, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Cogent is a facilities-based provider of low-cost, high-speed Internet access, private network services, optical wavelength and optical transport services and data center colocation space and power. The Company delivers its services to a diverse global base of businesses, communications service providers, and other bandwidth-intensive organizations in 57 countries across North America, Europe, South America, Asia, Oceania, and Africa.

3. On September 7, 2022, the Company announced an agreement to acquire T-Mobile's "Wireline" business (the "Acquisition"). The Acquisition included T-Mobile's vast North American fiber network, hundreds of buildings and technical sites with significant power capacity, and a sizeable customer base including many large enterprise customers.

4. At the time the Acquisition was announced, T-Mobile's Wireline business was losing money (operating with a negative 80% margin) and experiencing declining revenues of over 10% for the prior three years. Because it was suffering significant losses, T-Mobile sold the Wireline business in the Acquisition to Cogent for $1, subject to certain adjustments for net debt and net working capital. Moreover, as part of the Acquisition, T-Mobile contracted to pay Cogent $700 million in "IP transit services" for the continued use of the network over the next fifty-four months, with $350 million to be paid during the first year (the "IP Transit Services Agreement").

5. Despite the unprofitability of T-Mobile's Wireline business, the Individual Defendants touted the Acquisition and told investors that it offered Cogent strategic, technical, and long-term financial benefits and would bolster the Company's business. The Individual Defendants assured investors that it would manage the declining Wireline business by pruning unprofitable contracts while increasing operational efficiencies and repurposing acquired physical

assets to meet emerging demands for high-margin optical wavelength and transport services, such as from artificial intelligence ("AI") companies and data center businesses.

6. During the period of time between the announcement of the Acquisition and its closing (May 1, 2023), the Company provided financial guidance for its integrated operations, which indicated that Cogent would materially improve its revenue growth and profitability within five years of the Acquisition closing. The Individual Defendants stated that the key to achieving these financial targets was the Company's new optical wavelength business.[2] Indeed, the Individual Defendants told investors that its new wavelength business would be a di"meteoric" contributor to growth. For instance, during an earnings call to discuss the Company's financial results for the third quarter of 2022, Defendant Schaeffer stated, in relevant part, that "the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths. Today that is only an $8 million business [at Sprint]. . . . [W]e anticipate that within 5 years of closing, we can grow that to a $400 million business." By November 9, 2023, during the earnings call for the third quarter of 2023, Defendant Schaeffer had increased Cogent's wavelength business expectations to $500 million.

7. Throughout the Relevant Period, the Individual Defendants represented that demand for optical wavelengths in Cogent's newly acquired wireline business was exceptionally strong and rapidly growing, which would fuel the Company's growth. Specifically, the Individual Defendants assured investors that the Company had a substantial "backlog" in optical wavelengths, meaning the Company had sales orders or indications that needed to be completed, signaling that there was strong customer demand and increasing sales that could continue to fuel the Company's

[2] Optical wavelengths are light channels that transmit data in fiber optic networks and are used for high-bandwidth, low-latency point-to-point data transmission.

revenues, and that Cogent had sufficient financial strength to continue its long-standing dividend policy.

8. However, in reality, a substantial portion of the reported backlog was unlikely to become paying customer revenue, customer demand was weaker than represented, the Company's wavelength business was not performing at the levels necessary to support its reported financial targets, and the Company would not be able to maintain its dividend policy.

9. Simultaneously, Defendant Schaeffer took out millions of dollars' worth of loans that were backed by his Cogent shareholdings, which he used to build extensive real estate holdings and an investment portfolio in the D.C. metropolitan area. Pledging his shares to amass his personal wealth incentivized Defendant Schaeffer to maintain or increase Cogent's stock price.

10. The truth began to emerge on February 27, 2025, when the Company announced its financial results for the fourth quarter and full year for 2024 and it was revealed that Cogent's annual revenue run rate was only $28 million (a far cry from the 2028 target of $500 million) and its backlog had declined sequentially from 3,400 in the prior quarter to 2,700 in the fourth quarter. Additionally, the Company's growth in wavelength connections slowed from 287 net additions in the third quarter of 2024 to 77 net additions in the fourth quarter.

11. On this news, Cogent's stock price dropped $7.65 per share, or approximately 10%, to close at $72.46 per share on February 27, 2025.

12. The truth continued to emerge through a series of partial disclosures throughout the Relevant Period as the Individual Defendants continued to obfuscate the full truth about the Company's backlog, customer demand, revenues, and dividend program. The truth was fully revealed on May 4, 2026, when the Company announced its financial results for the first quarter of 2026. In the earnings call held for investors on that day, Defendant Schaeffer revealed that "On

wavelength installs, we have seen a variety of customers pushing out their acceptance of wavelengths. We actually provisioned more wavelengths in the quarter than we did in the previous quarter, but the customers did not accept them. Decision to push out acceptance is being driven by constraints."

13. On this news, Cogent's stock price declined $6.79 per share, or approximately 29%, to close at $16.37 per share on May 4, 2026.

14. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material facts to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15. While Cogent's stock traded at artificially inflated prices as a result of the misrepresentations described herein, the Insider Selling Defendants (defined below) sold more than $124 million of their personally held Cogent stock.

16. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying

class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

17. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Cogent's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

19. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

24. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Cogent maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

25. Plaintiff is, and has been at all relevant times, a continuous shareholder of Cogent.

***Nominal Defendant***

26. Nominal Defendant Cogent is incorporated under the laws of Delaware, with its principal executive offices located at 2450 N Street N.W., Washington, D.C. 20037. Cogent's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CCOI."

***Individual Defendants***

27. Defendant Schaeffer is the founder of Cogent and has served as the Company's Chief Executive Officer ("CEO") and President and as Chairman of the Board since the Company's founding. According to the Company's public filings, Defendant Schaeffer received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $12,680,860 |
| 2025 | $25,372,519 |

28. Defendant Weed has served as the Company's Vice President and Controller since May 2004 and as the Company's Chief Financial Officer ("CFO") and Treasurer since April 2022. Defendant Weed previously served as the Company's CFO and Treasurer from May 2004 until May 2020 and as the Company's Senior Vice President of Audit and Operations from May 2020 until April 2022. According to the Company's public filings, Defendant Weed received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $4,460,450 |
| 2025 | $4,828,550 |

29. Defendant de Sa has served as a director of the Company since December 2021. Defendant de Sa also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant de Sa received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $400,009 |
| 2025 | $443,308 |

30. Defendant Brooks has served as a director of the Company since October 2003. Defendant Brooks also serves as a member of the Board's Audit Committee. According to the

Company's public filings, Defendant Brooks received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $400,009 |
| 2025 | $443,308 |

31. Defendant Kennedy has served as a director of the Company since November 2019. Defendant Kennedy also serves as a member of the Board's Audit Committee. According to the Company's public filings, Defendant Kennedy received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $400,009 |
| 2025 | $443,308 |

32. Defendant Montagner has served as a director of the Company since April 2010 and as the Board's Lead Independent Director since February 2020. Defendant Montagner also serves as Chair of the Board's Compensation Committee. According to the Company's public filings, Defendant Montagner received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $399,309 |
| 2025 | $443,308 |

33. Defendant Ferguson has served as a director of the Company since October 2018. Defendant Ferguson also serves as Chair of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Ferguson received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2024 | $400,009 |

| | |
|---|---|
| 2025 | $442,308 |

34. Defendant Howell has served as a director of the Company since May 2022. Defendant Howell also serves as a member of the Board's Compensation Committee. According to the Company's public filings, Defendant Howell received the following total compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2024 | $399,909 |
| 2025 | $443,308 |

35. Defendant Howard has served as a director of the Company since June 2022. Defendant Howard also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Howard received the following total compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2024 | $400,009 |
| 2025 | $443,308 |

36. Defendant Bath served as a director of the Company from November 2006 until May 2025. According to the Company's public filings, Defendant Bath received the following total compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2024 | $397,009 |
| 2025 | $179,537 |

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

37. By reason of their positions as officers and/or directors of Cogent, and because of their ability to control the business and corporate affairs of Cogent, the Individual Defendants owed Cogent and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cogent in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cogent and its shareholders so as to benefit all shareholders equally.

38. Each director and officer of the Company owes to Cogent and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cogent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Cogent were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Cogent, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43. To discharge their duties, the officers and directors of Cogent were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cogent were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the District of Columbia, and the United States, and pursuant to Cogent's own Code of Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Cogent conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Cogent and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cogent's operations would comply with all applicable laws and Cogent's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44. Each of the Individual Defendants further owed to Cogent and the shareholders the

duty of loyalty requiring that each favor Cogent's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45. At all times relevant hereto, the Individual Defendants were the agents of each other and of Cogent and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, and directorial positions with Cogent, each of the Individual Defendants had access to adverse, non-public information about the Company.

47. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cogent.

## COGENT'S CODE OF CONDUCT

48. Cogent maintains a Code of Conduct, which "govern[s] the conduct and responsibilities of the directors, officers and employees of the Company and its subsidiaries."

49. The Code of Conduct states that all directors, officers, and employees of the Company and its subsidiaries must:

1) act with honesty and integrity and shall use due care and diligence in performing their responsibilities to the Company.

2) avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company and shall promptly disclose to the Chief Legal Officer or the chairman of the Audit Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict.

3) provide the board of directors, auditors, regulatory agencies and others, as necessary, with information that is accurate, complete, fair, relevant, timely and understandable, including information for inclusion in the Company's public statements or in submissions to governmental agencies.

4) comply with applicable laws, rules and regulations, the rules of any applicable

public or private regulatory and listing authorities and the policies and procedures established by the Company.

5) refrain in all cases from soliciting, receiving or giving gifts, bribes, facilitation payments or other similar remuneration or consideration whether directly for oneself or for a family member.

6) respect and safeguard the confidentiality of information acquired in the course of their work except as authorized or legally obligated to disclose such information. Confidential information acquired in the course of an individual's work for the Company shall not be used for personal advantage.

7) share knowledge and maintain skills important and relevant to the Company's needs.

8) promote high integrity in the work environment.

9) maintain control over and use for the benefit of the Company all Company assets and resources entrusted to them.

## COGENT'S AUDIT COMMITTEE CHARTER

50. Cogent's Audit Committee Charter states that the purpose of the Audit Committee is to "assist the Board with its oversight responsibilities regarding (i) the integrity of the Company's financial statements and audits thereof, (ii) the independent auditor's qualifications, independence and performance and (iii) the Company's accounting and financial reporting processes."

51. The Audit Committee Charter states that the Audit Committee has the following "[p]owers and [r]esponsibilities," among others:

1. *Appointment and Oversight.* The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor shall report directly to the Committee. . . .

3. *Investigations.* The Committee may conduct or authorize, if it considers appropriate, investigations into any matters within the scope of the powers

and responsibilities delegated to the Committee. . . .

**Annual Financial Statements and Annual Audit**

6. *Meetings with Management and Independent Auditor*.

(i) The Committee shall meet with management and the independent auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

(ii) The Committee shall review and discuss with management and the independent auditor: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (B) issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (C) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (D) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

(iii) The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

7. *Separate Meetings with the Independent Auditor*.

(i) The Committee shall review with the independent auditor any problems or difficulties the independent auditor may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the Independent Auditor are: (A) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise) and (B) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company. The Committee shall obtain from the independent auditor assurances that Section 10A(b) of the Exchange Act has not been implicated.

(ii) The Committee shall discuss with the independent auditor the report that such auditor is required to make to the Committee regarding: (A) all accounting policies and practices to be used that the independent auditor

identifies as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent auditor, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (C) all other material written communications between the independent auditor and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditor's engagement letter, independent auditor's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

(iii) The Committee shall discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees," as then in effect.

8. *Recommendation to Include Financial Statements in Annual Report*. The Committee shall, based on the review and discussions in paragraphs above, and based on the disclosures received from the independent auditor regarding its independence and discussions with the auditor regarding such independence pursuant to paragraphs above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

9. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statement.

**Quarterly Financial Statements**

10. *Meetings with Management and the Independent Auditor.* The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." . . .

**Data Privacy and Security and Enterprise Risk Assessment**. . . .

15. The Committee shall have oversight of any enterprise risk assessments by management concerning reviews of primary risks facing the Company, including environmental and sustainability risks, and the Company's associated risk mitigation measures.

16. The Committee shall have oversight of the Company's compliance with the requirements of the SEC disclosure of the auditor's services and audit

committee members, member qualifications and activities.

17. The Committee shall review management's monitoring compliance with the US Foreign Corrupt Practices Act and any similar applicable non-US regulations and laws.

**Other Powers and Responsibilities**

18. The Committee shall consider any correspondence from or with regulators or governmental agencies, any employee complaints, any legal matters or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function. Where the Committee believes additional review, investigation, or action is necessary it shall do so. . . .

21. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also establish procedures for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters. The Committee shall periodically review such procedures to ensure their effectiveness and to ensure the Company's compliance with such procedures.

22. The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the performance and independence of the Company's independent auditor, or any other matter the Committee determines is necessary or advisable to report to the Board.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

52. Headquartered in Washington, D.C., Cogent is a facilities-based provider of low-cost, high-speed Internet access, private network services, optical wavelength and optical transport services and data center colocation space and power. The Company offers its services in 57 countries across North America, Europe, South America, Asia, Oceania, and Africa.

53. The Company currently serves three different customer bases: (i) corporate; (ii) net-centric; and (iii) enterprise. Cogent's corporate customers are located in multi-tenant office buildings that typically house law firms, financial services firms, advertising and marketing firms,

health care providers, educational institutions and other professional services businesses. Cogent's net-centric customers include access networks comprised of other internet service providers, telephone companies, mobile operators and cable television companies as well as bandwidth-intensive users that leverage Cogent's network to deliver content to end users. Cogent's enterprise companies are large corporations that run Wide Area Networks with several dozen to several hundred sites.

54. Historically, including prior to and throughout the Relevant Period, Cogent offered quarterly dividends, which consistently increased quarter-after-quarter. The Individual Defendants repeatedly highlighted the number of quarters Cogent had increased its dividend throughout the Relevant Period. Indeed, the Company had increased its dividend for fifty-two quarters (or thirteen years) until it was slashed during the Relevant Period, as detailed herein.

***The Acquisition and Cogent's Optical Wavelength Business***

55. On September 7, 2022, the Company announced its agreement to acquire T-Mobile's Wireline business. The Acquisition included T-Mobile's vast North American fiber network, hundreds of buildings and technical sites with significant power capacity, and a sizeable customer base including many large enterprise customers. Specifically, Cogent would acquire approximately 19,000 long-haul route miles of fiber, 1,300 miles of metro fiber, and 16,800 route miles of leased dark fiber.

56. At the time the Acquisition was announced, T-Mobile's Wireline business was losing money (operating with a negative 80% margin) and experiencing declining revenues of over 10% for the prior three years. Because it was suffering significant losses, T-Mobile sold the Wireline business in the Acquisition to Cogent for $1, subject to certain adjustments for net debt and net working capital. Moreover, as part of the Acquisition, T-Mobile contracted to pay Cogent

$700 million in IP transit services for the continued use of the network over the next fifty-four months, with $350 million to be paid during the first year.

57. Despite the unprofitability of T-Mobile's Wireline business, the Individual Defendants touted the Acquisition and told investors that it offered Cogent strategic, technical, and long-term financial benefits and would bolster the Company's business. The Individual Defendants assured investors that it would manage the declining Wireline business by pruning unprofitable contracts while increasing operational efficiencies and repurposing acquired physical assets to meet emerging demands for high-margin optical wavelength and transport services, such as from AI companies and data center businesses.

58. During the period of time between the announcement of the Acquisition and its closing (May 1, 2023), the Company provided financial guidance for its integrated operations, which indicated that Cogent would materially improve its revenue growth and profitability within five years of the Acquisition closing. Specifically, the Company purported that it was on track to achieve annual revenue growth of 5% to 7% and set an aggregate revenue target of over $1.5 billion to be reached by mid-2028.

59. The Individual Defendants stated that the key to achieving these financial targets was the Company's new optical wavelength business. Indeed, the Individual Defendants told investors that its new wavelength business would be an outsized contributor to Cogent's growth. For instance, during an earnings call to discuss the Company's financial results for the third quarter of 2022, Defendant Schaeffer stated, in relevant part, that:

> ***But the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths. Today that is only an $8 million business [at Sprint]***.
>
> ***. . . [W]e anticipate that within 5 years of closing, we can grow that to a $400 million business***. So, when we add these 3 legs of growth together on a more

> normalized basis, getting past this initial ramp-up in the wavelength business, we should find the combined company with EBITDA margins in the low to mid-30s and the ability to grow topline 5% to 7% and the ability to expand margins consistently at about 100 basis points a year.[3]

60. By November 9, 2023, during the earnings call for the third quarter of 2023, the Company had increased its wavelength business expectations, with Defendant Schaeffer stating:

> ***And then to go to answer your question around a 5-year target, and I'm going to use 5 years from closing. So May of '23 to May of '28. We anticipate being on a run rate for wavelength sales of approximately $500 million*** and a total run rate for the combined business in excess of $1.5 billion, up from the $1.1 billion of $1.150 billion, $1.2 billion that we're running at right now.

61. Moreover, in its annual report for 2023 filed on Form 10-K with the SEC on February 29, 2024 (the "2023 10-K"), the Company touted that its revenue growth was driven primarily due to the wavelength business, stating:

> Management intends to reduce the negative cash flow of the Sprint Business through the payments from the IP Transit Services Agreement, reducing operating costs and ***increasing revenue primarily by providing optical wavelength and optical transport services over our fiber network, including the owned network we acquired with the Sprint Business***.

62. Because the Company was highly leveraged, Cogent had a very limited margin for error and its new optical wavelength business was critical for the Company to be able to preserve its credit rating and maintain its dividend policy. Indeed, after the Acquisition was announced, the Company reported that, as of September 30, 2022, Cogent had a gross leverage ratio of 5.31x, a net leverage ratio of 3.93x, and net debt of $914 million against trailing 12-month adjusted EBITDA of approximately $233 million. As of March 31, 2023 (which was the quarter before the Acquisition closed), Cogent reported increased gross leverage of 5.47x and increased net leverage of 4.46x, with total debt of approximately $1.27 billion and net debt of $1.04 billion. Thus, the

---

[3] Unless otherwise noted, emphasis is added.

Individual Defendants were incentivized to maintain the appearance of a successful optical wavelength business.

63. Throughout the Relevant Period, the Individual Defendants represented that demand for optical wavelengths in Cogent's newly acquired wireline business was exceptionally strong and rapidly growing, which would fuel the Company's growth. Specifically, the Individual Defendants assured investors that the Company had a substantial "backlog" in optical wavelengths, meaning the Company had sales orders or indications that needed to be completed, signaling that there was strong customer demand and increasing sales that could continue to fuel the Company's revenues, and that Cogent had sufficient financial strength to continue its long-standing dividend policy.

64. However, in reality, a substantial portion of the reported backlog was unlikely to become paying customer revenue, customer demand was weaker than represented, the Company's wavelength business was not performing at the levels necessary to support its reported financial targets, and the Company would not be able to maintain its dividend policy.

***Defendant Schaeffer Was Highly Dependent on the Price of Cogent Shares***

65. Additionally, Defendant Schaeffer was personally dependent on the price of Cogent shares. First, Defendant Schaeffer received compensation primarily in the form of Company stock awards that would vest in a number of years. For instance, in 2024, Defendant Schaeffer received total compensation of $12.7 million, the cash component of which was only $186,000, which came from a special incentive award linked to Cogent's optical wavelength sales. The remainder of Defendant Schaeffer's 2024 compensation was in the form of restricted stock awards ("RSAs"), which had a grant date value of approximately $12.5 million and were split between time-based RSAs (which consisted of 84,000 shares that would vest in 12 equal monthly increments beginning

on January 1, 2027) and performance-based RSAs (which consisted of up to 96,000 shares that were eligible to vest on April 1, 2027, based on certain multi-year (2024-2026) performance metrics). All of the RSA awards were to be earned or vested no earlier than 36 months from the grant date.

66. Defendant Schaeffer's personal wealth consisted primarily of two assets: (i) Cogent stock; and (ii) a substantial commercial real estate portfolio consisting mostly of Washington, D.C.-area office buildings. As of February 28, 2024, Defendant Schaeffer owned approximately 10% worth of the Company through his holdings. To build his real estate and investment portfolio, Defendant Schaeffer took out millions of dollars' worth of loans that were backed by his Cogent shareholdings. Due to his large amount of stock holdings and RSAs that had yet to vest and because he pledged his shares to grow his own personal wealth, Defendant Schaeffer was highly incentivized to maintain or increase Cogent's stock price throughout the Relevant Period. Indeed, if the price of Cogent stock fell significantly, Defendant Schaeffer risked a margin call that could require him to quickly sell large amounts of Cogent stock, thereby driving down the price of Cogent stock and causing his wealth to drop.

67. The Company's SEC filings recognized the risks to investors as a result of Defendant Schaeffer's pledging activities. Indeed, the Company's annual proxy statements filed on Schedule 14A with the SEC on March 25, 2024 (the "2024 Proxy"), and March 26, 2025 (the "2025 Proxy"), each stated that "a pledge of a significant number of shares of the Company's stock poses a risk to the Company and its other stockholders should a lender foreclose on the pledged shares and sell all or a significant portion of them in a manner that disrupts the market for the shares." To mitigate this risk, the Board's Audit Committee purportedly reviewed Defendant Schaeffer's pledging obligations quarterly and underwent extensive due diligence to evaluate his

real estate holdings. The Board also purportedly set various limits on Defendant Schaeffer's pledging behavior, including a pre-approval process that allegedly: (i) disallowed more than 5% of the Company's outstanding shares, on a fully diluted basis, to be pledged at any one time absent exceptional circumstances; (ii) disallowed an executive from pledging more than 50% of their personal Cogent holdings absent exceptional circumstances; (iii) considered the amount and type of other assets securing the full recourse loan; and (iv) considered the amount of the loan relative to the financial condition of the individual. By applying these factors, the Board and Audit Committee added to the substantial risk created by Defendant Schaeffer's pledging activities by allowing him to exceed the numerical limits set by the Company's pledging policy, telling investors that "there was not a material risk that he could be forced to sell Cogent shares involuntarily."

68. The harm to investors once the truth about the Company's business and financial prospects was revealed was made worse by Defendant Schaeffer's pledging activities as a fire sale of vast quantities of Cogent stock was forced due to lender margin calls on Defendant Schaeffer's loans.

***The Individual Defendants' Materially False and Misleading Statements***

69. Instead of disclosing the truth, the Individual Defendants caused Cogent to issue a series of materially false or misleading statements concealing the true nature of the Company's backlog, customer demand, and its ability to maintain its dividend policy.

70. On February 29, 2024, the Company issued a press release announcing its financial results for the fourth quarter of 2023 and year-end 2023 (the "4Q23 Earnings Release"). The Company also held an associated earnings call for investors and analysts on the same day (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Schaeffer touted the

Company's substantial backlog of optical wavelength orders, stating, in relevant part:

> As of today, we are selling wavelength services in 65 carrier neutral data centers. With expended provisioning cycles, we can also sell wavelengths and an additional 285 carrier neutral data centers or a total of 360 facilities across North America. We're generating $3.3 million of revenue from wavelength sales in the previous quarter with 667 discreet installed wavelengths.
>
> ***We have a significant funnel of wavelength orders in the pipeline. Today, we have a combination of orders signed as well as in our sales funnel of over 2,300 orders.***

71. During the question-and-answer portion of the 4Q23 Earnings Call, in response to a question about the Company's decision not to break out wavelength sales in the Company's 4Q23 Earnings Release and the Company's previous statement that wavelength sales would probably be around $20 million per quarter by mid-year, Defendant Schaeffer stated:

> So the decision on just not including it in the press release was so we would have a more fulsome opportunity to discuss it in the prepared remarks as we did. I think it is important to be able to disclose both the revenue run rate which was $3.3 million up sequentially and the unit count which was 667. We are still hampered by the number of sites that we can provision. ***The backlog has more than doubled sequentially in the quarter***.
>
> ***So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300. We actually anticipate, based on information from the sales force and our conversations with customers, that we're going to continue to see an acceleration in the order value***. We are frustrated by the amount of time it's taken to [wave] enable sites.
>
> We are still confident by year end that we will be able to have 800 sites that can provision waves with a kind of two-week average provisioning window. We are definitely not there today. ***As a result, we will probably not be on a run rate by mid-year of $20 million of installed business. I think we will have a funnel that will demonstrate that***, but the sheer number of sites that need to be touched and the number of steps that have to be done to convert the former Sprint voice network into a wavelength optimized network is a very daunting task. We are progressing well.
>
> There are over a thousand of our 2000 employees who are almost completely full-time focused on this effort. We absolutely will meet the year end targets, but ***I think by mid-year the funnel will demonstrate that run rate, but it probably will not be provisioned due to these extended provisioning windows in those 285 sites.***

72. When asked during the 4Q23 Earnings Call about whether he thought Cogent would be able to get through "that 2,300- order backlog by the end of the year" or whether the Company was "finding any customers finding alternative solutions because of the backlog," Defendant Schaeffer assured the public that "most of those orders" would be provisioned, stating:

> So Evan, I think two different things will happen. ***We will provision most of those orders, but there will be some customers who cannot wait***. We are trying to be very transparent with customers, and it's a site-by-site discussion on what that provisioning window will look like.
>
> We know that with the network reconfigurations that we have going on, we'll have more than double the number of sites and a standardized provisioning window by year end. But in the intervening time, if a customer needs to go somewhere else and we can't provision, we are going to let them out of that obligation. I mean, if we want to do business with them going forward, we need to understand that this is a Cogent problem and not the customer's problem.
>
> Conversely, as we continue to build credibility with customers and we get more sites enabled and shorter provisioning windows, we actually anticipate the pace of that funnel building actually accelerating. ***In the last quarter, it took us basically five months from closing to build a funnel of 1,000. In the last quarter, we got that up to 2,300. And yes, there have been some ball-out, but the net number grew, and I think that will continue to grow***.
>
> As I stated earlier, over the long run, I think it's not healthy to talk about funnels but install revenue. But until we get the network configured correctly and get enough sites where we can provision in an expeditious manner of a couple of weeks, we have to give both customers and investors an understanding of what the backlog looks like. Thanks.

73. Additionally, during the 4Q23 Earnings Call, Defendant Schaeffer confirmed for investors that Cogent's wavelength backlog supported the Company's long-term financial targets, stating in relevant part:

> ***Now for a couple of comments around our long-term targets. Now that Cogent is fully integrated and combined with the Sprint business, we anticipate our long-term average revenue growth to remain between 5% and 7% annually. And we expect our EBITDA margins as adjusted to increase by approximately 100 basis points annually***. This will be impacted in the short term by the step down in payments from T-Mobile.

74. Also on February 29, 2024, the Company filed the 2023 10-K with the SEC. The 2023 10-K was signed by Defendants Schaeffer, Weed, de Sa, Brooks, Kennedy, Bath, Montagner, Ferguson, Howell, and Howard. The 2023 10-K was also accompanied by certifications made pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), which were signed by Defendants Schaeffer and Weed and represented that the information contained in the 2023 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

75. The 2023 10-K confirmed that the Company expected to continue its dividend policy, stating, in relevant part, that:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $379 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy."

76. Additionally, the 2023 10-K confirmed that the Company was in a financial position to pay the dividend:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next twelve months and beyond the next twelve months if we execute our business plan.

77. On March 25, 2024, the Company filed the 2024 Proxy with the SEC. The 2024 Proxy was drafted, approved, reviewed, and/or signed by the Individual Defendants and solicited shareholders: (i) to vote for the reelection of Defendants Schaeffer, Montagner, Bath, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) to vote on the ratification of the Company's independent public accountant for 2024; and (iii) for an advisory vote to approve executive officer compensation. In soliciting these votes, the 2024 Proxy assured investors that the

Board was overseeing risks to the Company, stating, in relevant part:

> The Board's role in the Company is to provide general oversight of strategy and operations and to oversee the hiring, performance review, compensation review and termination, as applicable, of the executive officers of the Company. As part of its oversight of operations, it reviews the performance of the Company and the risks involved in the operations of the Company. The Board and the Audit Committee receive regular reports on the status of the Company's internal controls and each has reviewed key operational risks.

78. Thus, the Individual Defendants misleadingly assured investors that they understood Company-wide risks, actively oversaw risks to Cogent, and monitored the Company's internal controls and key operational risks. However, in reality, the Individual Defendants were failing in their oversight duties and allowed the Company to operate with inadequate internal controls, which resulted in the failure to prevent the Individual Defendants from causing the Company to make materially false and misleading statements concerning Cogent during the Relevant Period.

79. On May 9, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, Cogent reported wavelength revenue of $3.3 million for the quarter and that wavelength customer connections increased from 661 to 693.

80. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Schaeffer touted that Cogent would be able to offer wavelength services in over 800 locations in North America with "much more rapid provisioning cycles" by the end of 2024.

81. Also during the 1Q24 Earnings Call, Defendant Schaeffer acknowledged that while "all" of the customers from the Acquisition may not be able to wait for Cogent's ability to

provision them, that the Company's wavelength backlog was increasing, stating:

> The repurposing of the network to sell wavelength or optical transport services is progressing well. And the conversion of former Sprint switch sites and to data centers is also progressing, increasing Cogent's data center footprint and available power.
>
> ***We have a significant backlog and funnel of over 2,400 wavelength opportunities.*** However, due to these longer provisioning cycles, we are uncertain if all of these orders will remain with us through our ability to provision them. We will be able to reduce that provisioning cycle as we complete our network optimization and mirror the provisioning windows that we are able to achieve in our IP business.

82. During the 1Q24 Earnings Call, Defendant Schaeffer further highlighted that the Company was experiencing stronger than expected customer demand:

> ***So first of all, on wavelengths, we continue to grow our funnel. We're actually trying to discourage customers until we can give them more realistic provisioning time lines. The demand for the routes that we have and the data centers that we are targeting is stronger than we had initially expected***. As we outlined, we anticipate the wave business to be about a $500 million run rate business five years after the acquisition.
>
> We were hoping that we could grow that business linearly, meaning it would grow $100 million to $100 million business a year, post-closing $200 million in the second year. And our hope was based on the fact that the limited number of locations that we initially serve would actually be the locations that the market wanted. ***What we discovered as we began selling was that the wave demand was much more diffused across a much larger number of data centers. It's not that the demand is not there. It's just spread out into facilities that we could not provision. So we do still believe that there will be a $500 million business by run rate of May of '28***.
>
> I know that's a long time and investors want much nearer targets. The reconfiguration of the network is progressing. We are over halfway through bringing on the number of sites that we need. We are not though yet in a position to have the standardized delivery that I spoke about. That will be in place by year-end. We hope that that will allow us to eat into the backlog and to also accelerate new sales as we will be more comfortable in taking those orders with more standardized provisioning windows.

83. Also on May 9, 2024, the Company filed a quarterly report for the period ended March 31, 2024, on Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q was signed by

Defendants Schaeffer and Weed and accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented that the information contained in the 1Q24 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

84. The 1Q24 10-Q again confirmed that Cogent intended to continue its dividend policy, stating, in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $382 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy.

85. The 1Q24 10-Q also confirmed that the Company was in a financial position to pay its dividend, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

86. On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, the Company reported that wavelength revenue increased to $3.6 million for the quarter and that wavelength customer connections increased from 693 to 754.

87. On the same day, the Company hosted an accompanying earnings call to discuss its financial results for the quarter (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Schaeffer boasted that the Company anticipated wavelength revenues to "materially accelerate starting in early 2025," stating, "Our wave revenue increased modestly by 9% sequentially quarter-over-quarter to $3.6 million and that represents actually a 128.7% increase on a year-over-year basis. ***We expect this to materially accelerate starting in early 2025 as we will complete the network integration and optimization for wave services by year-end***."

88. Defendant Schaeffer further touted the Company's increased backlog in the quarter during the 2Q24 Earnings Call, stating:

> As of today, we have connectivity and wavelength capability services in 574 locations. However, our provisioning cycles remain elongated at about 90 days. We intend to substantially reduce that provisioning time as we complete the network optimization programs by year-end.
>
> We have sold wavelengths in 156 locations. By year-end 2024, we expect to be able to offer wavelength services in over 800 North American locations with substantially reduced provisioning cycles. ***We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths***.

89. Defendant Schaeffer assured investors that the Company would be better positioned to provision its increasing backlog by the end of the year, stating, in relevant part:

> We also remain focused on selling to large enterprises and are continuing to grow that business. We are enthusiastic and optimistic about the addition of optical transport services or wavelengths to our product portfolio and the expansion of our data center footprint.
>
> ***We have a significant backlog and funnel of these wave opportunities at over 2,700 discrete wavelengths***. And while we have accentuated provisioning cycles, we hope that with the network reconfiguration work, ***we can bring these orders installed in much shorter times by year-end***. We're diligently working to complete the integration of the Sprint network and the Cogent network and the optimization.

90. Also on August 8, 2024, the Company filed a quarterly report for the period ended June 30, 2024, on Form 10-Q with the SEC (the "2Q24 10-Q"). The 2Q24 10-Q was signed by Defendants Schaeffer and Weed and accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented that the information contained in the 2Q24 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

91. The 2Q24 10-Q once again confirmed that the Company expected to continue its longstanding dividend policy:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances,

we currently plan to continue our current dividend policy.

92. The 2Q24 10-Q also confirmed that the Company was in a financial position to be able to pay the dividend, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

93. On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). In the 3Q24 Earnings Release, the Company reported that wavelength revenue increased to $5.3 million and that wavelength customer connections increased from 754 to 1,041.

94. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the quarter (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Schaeffer touted the Company's wavelength backlog, stating "By the end of 2024, we expect to be able to offer wavelength services in over 800 locations with a much more rapid provisioning cycle. ***We have a backlog and funnel of wave opportunities of over 3,400 unique wavelengths***."

95. Also during the 3Q24 Earnings Call, Defendant Schaeffer acknowledged that the Company was unsure if all of the backlog orders would be installed, but did not give investors any indication that the majority of the backlog was, as would later be revealed, illusory. Specifically, Defendant Schaeffer stated "***We have a significant wavelength backlog, a funnel of over 3,400 wavelength opportunities. However, due to our longer provisioning cycles, we are not sure all of these orders will, in fact, be installed***. We will substantially reduce that provisioning window by quarter end."

96. Also on November 7, 2024, the Company filed a quarterly report for the period ended September 30, 2024, on Form 10-Q with the SEC (the "3Q24 10-Q"). The 3Q24 10-Q was signed by Defendants Schaeffer and Weed and accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented that the information contained in the 3Q24 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

97. The 3Q24 10-Q assured investors that the Company expected to continue its dividend policy, stating:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy.

98. The 3Q24 10-Q also confirmed that the Company was in a financial position to be able to pay the dividend, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

99. The above statements in ¶¶ 70-98 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the

Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

100. The truth began to emerge on February 27, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year for 2024 (the "4Q24 Earnings Release") and hosted an associated earnings call for investors and analysts (the "4Q24 Earnings Call"). In the 4Q24 Earnings Release, the Company reported that wavelength revenue for the quarter increased to $7 million and wavelength customer connections increased from 1,041 to 1,118. The growth in wavelength connections represented a slowdown, having gone from 287 net additions in the third quarter of 2024 to just 77 net additions in the fourth quarter.

101. Although the Company announced in the 4Q24 Earnings Call that Cogent had reached its year-end target of having 800 wave-enabled data centers and reduced its provisioning cycle to 30 days, investors were overall disappointed with the Company's financial and operating results for the quarter and year. Indeed, it was also revealed that Cogent's annual revenue run rate was only $28 million (a far cry from the 2028 target of $500 million) and its backlog had declined sequentially from 3,400 in the prior quarter to 2,700 in the fourth quarter.

102. On this news, Cogent's stock price dropped $7.65 per share, or approximately 10%, to close at $72.46 per share on February 27, 2025.

103. Analysts responded swiftly to the news. For instance, a TD Cowen analyst reported that "shares [were] pulled back likely on the weak Waves bookings" and noted that:

> **On the Wave business**, Cogent is clearly off to a slow start by installing just 77 Waves connections (vs. our estimate of 300) and delivering Waves revenue of just $8.0MM vs. our $7.2M and the St.'s $7.6MM. Cogent's Wavelength backlog decreased from 3,400 to 2,700 as mgmt.. noted that it kicked out 1,500 connections from the funnel as they became stale and presumably found business elsewhere. With the broader equity markets sensitive around all things AI (whether it was

> DeepSeek or Microsoft), the Cogent loss of Waves backlog adds more fuel to these skittish concerns. Cogent's prior messaging that it could add 500 connections per month has not become a "show me" having added just 77 connections in 4Q24. Still, mgmt.. did reach its target of 800 wave-ready data centers (and will actually have 880 data centers), encouragingly has lowered provision times to just 30 days (and will eventually reach two weeks), and reiterated its long-term Wave revenue target of $500MM by May 2028.[4]

104. A Wells Fargo analyst reported similar concerns about Cogent's wavelength business, stating that "A mixed print, with revenue declines offset by cost take-out, and wavelength revenues improving at a slower-than-hoped rate. Lots of questions on CCOI's ability to hold EBITDA steady as it awaits a wavelengths improvement and asset monetizations."

105. Despite the disappointing results and analyst reactions, the Individual Defendants continued to obfuscate the full truth from investors. For instance, during the 4Q24 Earnings Call, Defendant Schaeffer again misrepresented the demand for the Company's optical wavelength services and concealed the nature of the Company's backlog, stating, in relevant part, that "We have actually sold waves and installed them in 280 locations. ***And as we go through our existing sales funnel and backlog, some of those orders have dropped out, and at quarter-end, we still had 2,700 orders in our wavelength funnel***."

106. Moreover, Defendant Schaeffer assured investors that the Company was in a position to fill its backlog orders timely and meaningfully, stating, in relevant part:

> We have a significant backlog and funnel of over 2,700 opportunities. While this is down slightly from the previous quarter, it's been due to grooming that funnel. Many of those opportunities have been in the funnel for over a year as we could not provision them.
>
> But now with the ubiquitous coverage and the more rapid provisioning cycles, we believe that we will continue to accelerate our wavelength business. We do have reduced provisioning cycles, and we hope to convert many of these opportunities and funnel into installed orders.

---

[4] Emphasis in original.

107. Also during the 4Q24 Earnings Call, Defendant Schaeffer stated that backlog installations would increase to approximately 500 waves per month, which would increase new orders, stating:

> With regard to the pacing of installs, we are ramping up to our full install capabilities. And we have both the field resources and service delivery coordinators to support the 500 a month. ***The hard part now has been working through the backlog that we have and flushing out which orders are still available for install and in which the customers had to go somewhere else. And some of these orders have been in the funnel for over a year. And that is a time-consuming process.***
>
> ***And we have groomed the funnel. It did shrink, even though there were some new orders coming into the funnel. And now, we expect the funnel to actually accelerate in new order intake as we have demonstrated our ability to install. I think we're still probably a month or two away from getting to kind of full cadence of 500 installs a month as a result of this grooming exercise because it does take an iterative back and forth with the customer***.

108. Additionally, Defendant Schaeffer represented during the 4Q24 Earnings Call that the Company's wavelength business was on track to achieve its 2028 target of $500 million annual revenue rate and that customer demand remained robust, stating:

> ***We feel very comfortable about the target that we laid out at the closing of the deal in May of '23 and said within five years, we would be at a run rate of $500 million annually in wavelength sales. We think that the demand that we have received both in terms of order backlog and continued customer interest gives us a great deal of confidence we're going to make that number, particularly as we prove to the market our ability to actually deliver.***
>
> The fact that there have been some customers in the funnel for over a year that are still taking waves is to me a little surprising, but some of them had enough confidence in us and we have delivered. For others, I think we have to build credibility and the way we're going to do that is install these waves. ***But we're very comfortable with our $500 million by mid-'28 target for wavelength revenue.***

109. On February 28, 2025, the Company filed an annual report for 2024 on Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K was signed by Defendants Schaeffer, Weed, de Sa, Brooks, Kennedy, Bath, Montagner, Ferguson, Howell, and Howard. The 2024 10-K was also accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented

that the information contained in the 2024 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

110. The 2024 10-K assured investors that the Company expected to continue its dividend policy, stating, in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years. . . .
>
> In light of the economic uncertainties associated with the global economy, evolving hybrid work arrangements, the cash flow requirements of the Sprint Business, and the uncertain impact of proposed changes to economic and fiscal policies in the United States and other countries, our executive officers and Board of Directors have continued to carefully monitor our liquidity and cash requirements as well as our capital spending. ***After consideration of these circumstances, we currently plan to continue our current dividend policy.***

111. The 2024 10-K also reported that the Company was in a financial position to be able to pay the dividend, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

112. On March 26, 2025, the Company filed the 2025 Proxy with the SEC. The 2025 Proxy was drafted, approved, reviewed, and/or signed by the Individual Defendants and solicited shareholders: (i) to vote for the reelection of Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) to vote to approve an amendment to the Company's Bylaws setting the Board size to be between six to eight directors; (iii) to vote to approve the Company's Second Amended and Restated 2017 Incentive Award Plan, which included an increase in the number of shares available for issuance thereunder by 1.5 million shares; (iv) to vote on the ratification of the Company's independent public accountant for 2025;

and (v) for an advisory vote to approve executive officer compensation. In soliciting these votes, the 2025 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

> The Board's role in the Company is to provide general oversight of strategy and operations and to oversee the hiring, performance review, compensation review and termination, as applicable, of the executive officers of the Company. As part of its oversight of operations, it reviews the performance of the Company and the risks involved in the operations of the Company. The Board and the Audit Committee receive regular reports on the status of the Company's internal controls and each has reviewed key operational risks.

113. Thus, the Individual Defendants misleadingly assured investors in the 2025 Proxy that they understood Company-wide risks, actively oversaw risks to Cogent, and monitored the Company's internal controls and key operational risks. However, in reality, the Individual Defendants were failing in their oversight duties and allowed the Company to operate with inadequate internal controls, which resulted in the failure to prevent the Individual Defendants from causing the Company to make materially false and misleading statements concerning Cogent during the Relevant Period.

114. The above statements in ¶¶ 105-113 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially

false and misleading and/or lacked a reasonable basis at all relevant times.

115. The truth was again partially revealed on May 8, 2025, when the Company issued a press release announcing its financial results for the first quarter of 2025 (the "1Q25 Earnings Release") and hosted an associated earnings call for investors and analysts (the "1Q25 Earnings Call").

116. In the 1Q25 Earnings Release, the Company reported that wavelength revenue increased to $7.1 million and wavelength customer connections increased from 1,118 to 1,322. Investors were again disappointed by Cogent's wavelength business. Revenues were lower than expected, which had negatively impacted the Company's earnings, margins, and leverage. Although the Company revealed in the 1Q25 Earnings Call that it had expanded its offering of optical wavelength services to 883 data centers across North America, wavelength revenues increased by only $200,000 from the fourth quarter of 2024.

117. During the 1Q25 Earnings Call, Defendant Schaeffer told investors that Cogent now had the capacity to provision 500 orders per month, but "[w]ith a 3,400 order backlog in funnel, that represents [] a 5% conversion rate," only constituting "about 160" orders. In other words, Cogent had more installation capacity than orders that were ready to be installed. Defendant Schaeffer further admitted during the 1Q25 Earnings Call "nearly 90% of the total funnel [of backlogs] that existed at the end of Q3 2024 fell out" and that this shocking outcome was "as expected" because "[t]hose customers went elsewhere, because they could not wait for our deliveries."

118. On this news, Cogent's stock price dropped $3.91 per share, or approximately 7%, to close at $49.30 per share on May 8, 2025.

119. Analysts again responded negatively. For instance, a J.P. Morgan analyst related

the decrease in stock price to the disappointing wavelength business results, stating, in relevant part, "Cogent's 1Q25 results were fine, but equity investors were underwhelmed with the company's progress on selling wavelength services. . . ." The analyst further discussed the market's reaction to Cogent's news:

> **But slower than expected wave sales**. Analyst projections for wave sales in 1Q were $10mn. But CCOI fell short of that with only $7.1mn in sales. The sale of wavelengths is a new business for Cogent, and its performance will likely have an outsized impact on how investors view its securities. Thus, the miss may have been the driving factor behind the company's double-digit stock sell-off following the release of results.[5]

120. Furthermore, an analyst from Deutsche Bank noted that "Overall, the report was weak with both revenue and EBITDA behind the street. Wavelength sales growth was lackluster for a second quarter in a row which is somewhat concerning as this is the offset story to inherited Sprint losses."

121. However, despite revealing these disappointing results for its optical wavelength business, the Individual Defendants continued to make materially false and misleading statements about the Company's prospects in order to maintain the artificially inflated stock price. For instance, during the 1Q25 Earnings Call, Defendant Schaeffer attempted to hide the true nature of the Company's backlog and customer demand issues, assuring investors that Cogent remained on track to achieve its mid-2028 revenue target of $500 million (*i.e.*, 25% of the $2 billion North American market), stating, in relevant part:

> We have provisioned and cleaned up our former backlog of wavelength orders. ***We currently have a backlog and funnel of 3,433 wavelength opportunities. With more wave provisioning experience and the actual ability to deliver services, we now anticipate that between 4% and 5% of this funnel will be installed each month going forward***. We also expect based on the growth in the sales activity that by year-end, there will be 10,000 unique Wave opportunities in our funnel. We currently have provisioning capacity to install 500 waves per month. ***We intend to***

[5] Emphasis in original.

> ***capture 25% of this highly concentrated North American market within three years.***

122. Additionally, Defendant Schaeffer touted that the Company had clarity into its backlog and expected to grow its orders by year-end, stating, in relevant part:

> ***The funnel that we have now of 3,433 orders is a completely rebuilt funnel that was rebuilt from the end of Q3 2024 to the end of Q1 2025. We now have much more clarity around locations and about timing to be able to install.***
>
> At 883 locations, we can now install in 30 days. We have sufficient field resources, pluggable optics and service delivery coordinators to be able to provision 500 orders a month. ***With a 3,400-order backlog in funnel, which represents with a 5% conversion rate about 160. So, we have more installation capacity than orders that are ready to install.***
>
> As we build credibility with customers, we will both see an uptick in the number of opportunities going into that funnel***. Based on the sales forecast that we have, we anticipate that funnel to reach 10,000 from 3,430 by year-end, so in the next seven months.***

123. Defendant Schaeffer further tried to portray a picture of robust customer demand and noted that Cogent increased its long-term guidance for the Company's annual revenue growth, stating, in relevant part:

> Now that the Sprint business is combined with our legacy business, and we have fully analy[z]ed the revenue burn off of undesirable revenues, ***we are adjusting our long-term annual revenue growth rates to 6% to 8%, and we are increasing the rate at which we anticipate our EBITDA as adjusted margin to expand annually to 150 basis points.***

124. Also on May 8, 2025, the Company filed a quarterly report for the period ended March 31, 2025, on Form 10-Q with the SEC (the "1Q25 10-Q"). The 1Q25 10-Q was signed by Defendants Schaeffer and Weed and accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented that the information contained in the 1Q25 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

125. The 1Q25 10-Q confirmed that the Company expected to continue its dividend

policy, stating, in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $397 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy.

126. The 1Q25 10-Q also assured investors that Cogent was in a financial situation to be able to pay the dividend, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

127. The above statements in ¶¶ 121-126 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

128. On August 7, 2025, the Company issued a press release announcing its financial results for the second quarter of 2025 (the "2Q25 Earnings Release") and hosted an associated earnings call for investors and analysts to discuss the financial results (the "2Q25 Earnings Call").

129. In the 2Q25 Earnings Release, the Company reported that wavelength revenue increased to $9.1 million and that wavelength customer connections increased from 1,322 to 1,469

for the quarter. These results were again disappointing to investors. The Company only added 147 net connections during the quarter (compared to 204 in the first quarter of 2025), which was significantly fewer than the Individual Defendants' prior claims that Cogent would be installing 4% to 5% of its 3,433 wavelength backlog (approximately 155 wavelengths) per month.

130. During the 2Q25 Earnings Call, Defendant Schaeffer stated that "We have several hundred wavelengths that have been installed but have not yet [billed] due to customers' inability to accept the services as they are preparing their equipment to receive those wavelengths." Defendant Schaeffer also stated that "We have surprised our customers both in terms of where and how quickly we could deliver."

131. Additionally, the Company revealed in the 2Q25 Earnings Release that its gross leverage ratio increased for the second quarter to 8.65x from 6.69x in the first quarter of 2025 and its net leverage ratio increased to 7.52x from 6.08x due to debt issued in April. The Company also reported reduced trailing 12-month EBITDA due to lower payments by T-Mobile under the IP Transit Services Agreement. These facts further undermined Individual Defendants' claims about Cogent's backlog, customer demand, and the Company's ability to continue its long-standing dividend policy.

132. On this news, Cogent's stock price declined $8.54 per share, or approximately 19%, to close at $35.34 on August 7, 2025. The following day the stock price continued to decline, dropping an additional $4.72 per share, or approximately 13%, to close at $30.62 on August 8, 2025.

133. In response, a BofA Securities analyst reported on the investor reaction to Cogent's wavelength results:

**Wavelength delays take the full spotlight of the 2Q print**

> We reiterate our Underperform rating, lower our PO to $30 (from $50), and adjust our income rating to '8' same/lower from '7' same/higher for CCOI. Focus points on CCOI's 2Q25 results were 1) lack of wavelength business ramp, 2) data center optimization efforts, and 3) capital allocation philosophy. CCOI's wavelength business installed only 147 connections in 2Q (vs. Street expectations of 500). CCOI noted there are several hundred waves connected with customers, but not being billed due to customer capabilities. CCOI continues to shop >100MW of data center capacity to potential buyers at ~$10mn a MW, but a deal remains unstruck much to investors dismay. The CCOI story remains a "show me" story as management has not delivered on its wavelength business ramp, even with the business being fully enabled since 1Q. CCOI's leverage also remains high vs. historic levels and the company quarterly dividend payout is unsustainable at current operating and leverage trajectory.[6]

134. Similarly, a J.P. Morgan analyst lowered its estimate on the Company's mid-2028 revenue target and questioned the Company's slow growth in sales and installations, stating:

> Cogent reported mixed 2Q results with better revenue (improved revenue decline q/q) but weaker EBITDA ($73m vs our $79m) due to lower margins. At the same time, CCOI's (billable) Waves installs were once again weaker than expected as customers were once again unable to accept delivery due to the company's rapid provisioning times. <u>We question this dynamic and believe the slower ramp in installs is reflective of increased competition across the Waves ecosystem as well as growing pains. Accordingly, we lower 3Q25+ install expectations and meaningfully reduce our long-term Waves estimates on the above: we now forecast 2025 Waves revenue of $39m and annualized Waves revenue of $160m by mid-2028 (vs. management's target of $500m).</u> Relatedly, while CEO Schaeffer is confident in Cogent's ability to de-lever while increasing capital returns, we question CCOI's decision to begin buying back stock given leverage (6.6x on an adjusted basis exiting 2Q25) and liquidity concerns, and also believe it would be prudent for the company to pause its dividend growth. <u>Questions on Cogent's EBITDA growth algorithm due to pressured legacy trends and a slower Waves ramp as well as diminishing prospects of a data center monetization event near-term will only heighten fears of a pending dividend cut in the coming quarters.</u>

135. Notwithstanding the negative results, the Individual Defendants continued to mislead investors about the true state of the Company's backlog, customer demand, and ability to make its dividend. For instance, during the 2Q25 Earnings Call, Defendant Schaeffer touted the Company's purported fulsome backlog and shortened provisioning time, stating:

---

[6] Emphasis in original.

> As of the end of the quarter, we were offering wave line services in 938 data centers at 10 gig, 100 gig and 400 gig service models, materially, ***we also have reduced our provisioning intervals for approximately 30 days***.
>
> Our wavelength revenues for the quarter were $9.1 million, a 150% increase on a year-over-year basis and a sequential increase of that revenue stream of 27%. As of the end of the quarter, we have sold wavelengths in 418 locations. ***We currently have a backlog and funnel of 4,687 wavelength opportunities.***

136. Defendant Schaeffer also reiterated to investors during the 2Q25 Earnings Call the Company's long-term revenue growth guidance and increase in long-term EBITDA margin, stating:

> ***We anticipate our long-term average revenue growth to be between 6% and 8%. And we expect our EBITDA as adjusted margins to expand by approximately 200 basis points annually***. Our updated revenue and EBITDA guidance targets are meant to be multiyear targets and are not intended to be specific quarterly or annual guidance.

137. In response to an analyst question during the 2Q25 Earnings Call about the Company's ability to reach its mid-2028 $500 million target, Defendant Schaeffer assured investors that he was confident the Company could meet its target, stating:

> So first of all, on the confidence on wavelengths, we are actually more confident today than we were on last quarter's call or the quarter before or since we acquired Sprint. The reception that we have received from the customer base, the orders that we have in our funnel and the customer feedback that we've gotten from the orders that we have installed, all give us confidence that we will reach our $500 million run rate on wavelength revenue by mid-year 2028, which is identical to what we laid out in our justification in September of '22 when we announced the potential transaction that ultimately closed in May of '23.

138. Also during the 2Q25 Earnings Call, Defendant Schaeffer reaffirmed that the Company would have a $20 million run rate in wavelength sales by the end of the fourth quarter, stating:

> Yes, we still feel confident that we will hit that quarterly run rate in the fourth quarter. And I do want to go back to the overpurchasing and delay comment. That is not what we've heard from customers. It's really we're just surprised you did it when you said you would do it.

139. On August 7, 2025, the Company filed a quarterly report for the period ended June 30, 2025, on Form 10-Q with the SEC (the "2Q25 10-Q"). The 2Q25 10-Q was signed by Defendants Schaeffer and Weed and accompanied by SOX Certifications signed by Defendants Schaeffer and Weed, which represented that the information contained in the 2Q25 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

140. The 2Q25 10-Q once again confirmed that the Company expected to continue its dividend policy, stating:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy.

141. The 2Q25 10-Q also confirmed that the Company was in a financial position to be able to make the dividend payment, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

142. The above statements in ¶¶ 135-141 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the

Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

143. On November 6, 2025, the Company issued a press release announcing its financial results for the third quarter of 2025 (the "3Q25 Earnings Release"). In the 3Q25 Earnings Release, the Company reported that wavelength revenue increased to $10.2 million for the quarter and the number of customer connections increased by only 281 from the last quarter (from 1,469 to 1,750). Because of these weak results, the Company paused stock buybacks and reduced its quarterly dividend from $1.015 per share to $0.02 per share, which constituted a 98% reduction. This was the first reduction of the dividend in 52 quarters.

144. On the associated earnings call for investors and analysts held on the same day (the "3Q25 Earnings Call"), Defendant Schaeffer told investors that the Company "intend[s] to maintain our updated dividend policy until we reach a net leverage target of 4x EBITDA on an LTM basis." Also on the 3Q25 Earnings Call, Defendant Schaeffer stated that he was not confident in the $20 million revenue run rate, stating "I am not today confident enough that the customers will accept them and we can start recognizing that revenue. . . ."

145. On this news, Cogent's stock price dropped significantly over the next several days, declining a total of $21.62 per share, or approximately 56%, between November 5, 2025, and November 13, 2025. Specifically, the stock price went from $38.30 on November 5, 2025, to $16.68 per share on November 13, 2025.

146. Analysts responded quickly to the Company's results. For instance, a Wells Fargo analyst cut his wavelength sales estimates to $200 million by 2028, which was less than half of the Company's $500 million target. The analyst noted that:

> **Dividend cut and buybacks suspended with full prioritization on deleveraging**. CCOI cut its quarterly dividend to $0.02/shr (from $1.015) and temporarily paused

> stock buybacks. The dividend will remain fixed until the company deleverages to 4.0x (from 7.4x in Q3), which will take significant time unless CCOI executes on significant asset sales. It also creates the pain of transitioning an income-focused shareholder base to a story that still has serious question marks on future growth.
>
> **Wavelength growth remains slower than hoped.** Wavelength revenue was $10.2M in Q3, +12% seq. vs. +27% seq. growth in Q2, with +281 net installs coming in below our expectations. Mgmt also was hesitant on its previous aspiration to reach a $20MM annualized run-rate by Q4. With customers not as prepared to accept services quickly – and a notable competitive response from LUMN and T – we're slashing our waves estimates, including a modest ramp to nearly $200MM by 2028.[7]

147. Similarly, an analyst from RBC Capital Markets doubted the Company's $500 million target, stating:

> Wavelength additions at 281 came well below consensus at ~500. In our view, the demand for the wavelength business has not materialized to ramp to 500 monthly installs and eventually hit its $500M wavelength run-rate revenue target by mid-2028. Like the previous quarter, the company installed more wavelengths than customers accepted. For Q4, we expect a marginal improvement in wavelength additions to 400.

148. Despite the disappointing results and decreased dividend, the Individual Defendants continued to try to hide the full truth from investors by highlighting the Company's purported robust backlog. For instance, during the 3Q25 Earnings Call, Defendant Schaeffer touted the Company's backlog and assured investors that Cogent remained on track to meet its mid-2028 wavelength revenue goals, stating, "We currently have a backlog and funnel of wave opportunities of 5,221 opportunities. We intend to continue to capture market share and believe our goal of 25% of the highly concentrated long-haul wavelength market in North America in three years is achievable."

149. The above statements in ¶ 148 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

---

[7] Emphasis in original.

Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

150. In addition to making the above-detailed materially false and misleading statements to the public, the Individual Defendants also caused the Company to violate Items 303 and 105 of the SEC Regulations. Indeed, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), required the Individual Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its periodic quarterly and annual financial reports filed with the SEC. Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of these reports, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

151. Under Item 303, due to the importance of Cogent's optical wavelength business to the Company's financial operations and prospects, Cogent's periodic reports were required to describe the known trends and uncertainties relating to the backlog in the Company's wavelength orders, including adverse client demand trends and the high likelihood that these orders would never be consummated. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Cogent common stock

speculative and risky. However, the Company failed to properly follow Items 303 and 105. Indeed, the boilerplate risk discussions provided in the Company's SEC filings were themselve*s* materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had already transpired and therefore posed an imminent threat to the Company's business and operations. For instance, the "Risk Factors" contained in the Company's 2023 10-K stated that the Company "***may*** not realize the anticipated benefits of the acquisition of the Sprint Business" and "***may*** not succeed" in adding customers. However, the 2023 10-K failed to disclose that the vast majority of the Company's claimed backlog was illusory and that the Company was already experiencing difficulty in adding and retaining customers for its optical wavelength products and services. Rather, the 2023 10-K stated "We ***may*** not realize the anticipated benefits of the acquisition of the Sprint Business, and the integration of the Sprint Business may disrupt our business and management."

152. On February 20, 2026, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2025 (the "4Q25 Earnings Release"). In the 4Q25 Earnings Release, the Company reported that wavelength revenue increased to $12.1 million for the quarter and that wavelength customer connections increased by 314 connections, from 1,750 to 2,064.

153. During the associated earnings call held on the same day to discuss the financial results (the "4Q25 Earnings Call"), the Individual Defendants refused to provide specific backlog amounts, a change from Cogent's usual practice. When Defendant Schaeffer was asked during the 4Q25 Earnings Call about the Company's 10,000 backlog target by the end of 2025, he explained that the Company was no longer going to provide "specific numbers," stating:

> And now, Sam, I'll touch on your waves question. While we were in the process of enabling the footprint, we felt it was critical to give funnel KPIs to show

> expressions of interest by customers. We have tried to be clear with investors that we do not give funnel data routinely for our other products, and we're treating wavelengths now as any other product. Now we do in our investor presentation typically show both our on-net and off-net conversion rates for the previous quarter. We intend to continue to do that.
>
> ***Our funnel is continuing to grow, but we will not be reporting specific numbers.*** But we do anticipate with the footprint that we now have and the credibility that we are earning with existing customers, we are starting to see a larger percentage of their wave opportunities being shown to us for bid. And as a result of that, we will close more and see further acceleration in the waves business.

154. On this news, Cogent's stock price fell $7.72 per share, or approximately 29%, to close at $18.59 per share on February 20, 2026. The stock price declined again on the next trading day, dropping another $0.72 per share, or approximately 4%, to close at $17.87 on February 23, 2026.

155. On March 20, 2026, the Company filed a proxy statement on Schedule 14A with the SEC (the "2026 Proxy"). The 2026 Proxy was drafted, approved, reviewed, and/or signed by the Individual Defendants and solicited shareholders: (i) to vote for the reelection of Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) to vote to approve the Company's Third Amended and Restated 2017 Incentive Award Plan, which included an increase in the number of shares available for issuance thereunder by 1.5 million shares; (iii) to vote on the ratification of the Company's independent public accountant for 2026; and (iv) for an advisory vote to approve executive officer compensation. In soliciting these votes, the 2026 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

> The Board's role in the Company is to provide general oversight of strategy and operations and to oversee the hiring, performance review, compensation review and termination, as applicable, of the executive officers of the Company. As part of its oversight of operations, it reviews the performance of the Company and the risks involved in the operations of the Company. The Board and the Audit Committee receive regular reports on the status of the Company's internal controls and each

has reviewed key operational risks.

156. Thus, the Individual Defendants misleadingly assured investors in the 2026 Proxy that they understood Company-wide risks, actively oversaw risks to Cogent, and monitored the Company's internal controls and key operational risks. However, in reality, the Individual Defendants were failing in their oversight duties and allowed the Company to operate with inadequate internal controls, which resulted in the failure to prevent the Individual Defendants from causing the Company to make materially false and misleading statements concerning Cogent during the Relevant Period.

***The Truth Is Fully Revealed***

157. On May 4, 2026, the truth was fully revealed when the Company issued a press release announcing its financial results for the first quarter of 2026 (the "1Q26 Earnings Release") and held an associated earnings call for investors and analysts to discuss the results (the "1Q26 Earnings Call"). In the 1Q26 Earnings Release, Cogent reported that its wavelength revenue increased to $13.6 million for the quarter and that its wavelength customer connections increased by only 199 connections, from 2,064 the prior quarter to 2,263.

158. During the 1Q26 Earnings Call, Defendant Schaeffer finally admitted that:

> On wavelength installs, we have seen a variety of customers pushing out their acceptance of wavelengths. We actually provisioned more wavelengths in the quarter than we did in the previous quarter, but the customers did not accept them. Decision to push out acceptance is being driven by constraints.

159. On this news, the Company's stock price declined $6.79 per share, or approximately 29%, to close at $16.37 per share on May 4, 2026.

160. On May 26, 2026, a Morningstar analyst commented on the Company's wavelength business in light of the disclosures, stating, in relevant part, that "Accelerating growth in the wavelength business is most critical to meeting our growth expectations and moving the shares

higher from here. ***Management has overpromised and underdelivered in this segment***. . . .”.

***Insider Sales***

161. Rather than providing the market with correct information, Defendants Schaeffer, Ferguson, Kennedy, Weed, and Bath (the “Insider Selling Defendants”) used their knowledge of Cogent's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Cogent, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. Notably, only one sale was made pursuant to a trading plan.

162. As a result of the below improper insider sales, the Insider Selling Defendants sold over $124 million worth of stock at artificially inflated prices

163. While in possession of material nonpublic information, Defendant Schaeffer sold over 3.3 million shares of his personally held Cogent stock for proceeds of over $121.3 million. Defendant Schaeffer’s sales were timed to maximize profit from Cogent’s then artificially inflated stock price. Specifically, Defendant Schaeffer made the following sales of Cogent stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction (Rounded to Nearest Dollar) |
|---|---|---|---|
| 3/6/2024 | 8,826 | $72.55 | $640,326 |
| 3/13/2024 | 30,000 | $67.52 | $2,025,600 |
| 3/15/2024 | 26,174 | $64.21 | $1,680,633 |
| 5/13/2024 | 50,000 | $59.44 | $2,972,000 |
| 6/12/2024 | 60,000 | $54.60 | $3,276,000 |
| 6/14/2024 | 60,000 | $51.78 | $3,106,800 |
| 8/27/2024 | 60,000 | $72.82 | $4,369,200 |
| 5/22/2025 | 25,000 | $46.27 | $1,156,750 |
| 5/27/2025 | 20,000 | $48.67 | $973,400 |
| 6/4/2025 | 75,000 | $47.76 | $3,582,000 |
| 6/6/2025 | 80,000 | $47.78 | $3,822,400 |
| 6/9/2025 | 55,000 | $48.64 | $2,675,200 |
| 6/11/2025 | 55,000 | $48.51 | $2,668,050 |

| | | | |
|---|---|---|---|
| 6/13/2025 | 55,000 | $47.40 | $2,607,000 |
| 6/16/2025 | 70,000 | $47.11 | $3,297,700 |
| 8/7/2025 | 1,840,669 | $32.60 | $60,005,809 |
| 8/8/2025 | 818,909 | $27.50 | $22,519,998 |

164. While in possession of material nonpublic information, Defendant Ferguson sold over 12,000 shares of his personally held Cogent stock for proceeds of approximately $550,329. Defendant Ferguson's sales were timed to maximize profit from Cogent's then artificially inflated stock price. Specifically, Defendant Ferguson made the following sales of Cogent stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction (Rounded to Nearest Dollar) |
|---|---|---|---|
| 5/21/2024 | 2,000 | $58.90 | $117,800 |
| 8/22/2024 | 1,550 | $72.62 | $112,561 |
| 11/18/2024 | 846 | $81.76 | $69,169 |
| 3/12/2025 | 956 | $69.36 | $66,308 |
| 5/28/2025 | 1,100 | $47.57 | $52,327 |
| 12/2/2025 | 4,000 | $20.34 | $81,360 |
| 3/5/2026 | 2,206 | $23.03 | $50,804 |

165. While in possession of material nonpublic information, Defendant Kennedy sold over 10,000 shares of her personally held Cogent stock for proceeds of approximately $398,527. Defendant Kennedy's sales were timed to maximize profit from Cogent's then artificially inflated stock price. Specifically, Defendant Kennedy made the following sales of Cogent stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction (Rounded to Nearest Dollar) |
|---|---|---|---|
| 5/23/2024 | 1,640 | $57.79 | $94,776 |
| 3/3/2025 | 1,425 | $72.96 | $103,968 |
| 8/21/2025 | 2,000 | $36.35 | $72,700 |
| 11/11/2025 | 2,400 | $21.34 | $51,216 |
| 3/5/2026 | 3,300 | $22.99 | $75,867 |

166. While in possession of material nonpublic information, Defendant Weed sold 21,950 shares of his personally held Cogent stock for proceeds of approximately $1.2 million. Defendant Weed's sales were timed to maximize profit from Cogent's then artificially inflated stock price. Specifically, Defendant Weed made the following sales of Cogent stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction (Rounded to Nearest Dollar)** |
|---|---|---|---|
| 6/10/2024 | 2,400 | $52.60 | $126,240 |
| 12/2/2024 | 4,800 | $81.58 | $391,584 |
| 3/3/2025 | 4,900 | $72.06 | $353,094 |
| 5/28/2025 | 100 | $47.66 | $4,766 |
| 6/9/2025 | 4,900 | $48.04 | $235,396 |
| 3/5/2026 | 4,850 | $22.63 | $109,756 |

167. While in possession of material nonpublic information, Defendant Bath sold 6,220 shares of his personally held Cogent stock for proceeds of approximately $520,551. Defendant Bath's sales were timed to maximize profit from Cogent's then artificially inflated stock price.

168. The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Cogent's stock price. While the Individual Defendants made materially false and misleading statements, the Company's stock price rose to as high as $86.76 per share on November 7, 2024. When the truth fully emerged, the Company's stock price fell to $16.37 per share on May 4, 2026. Notably, the Insider Selling Defendants' sales ranged from $20.34 to $81.76 per share. As a result of these insider sales, the Insider Selling Defendants were unjustly enriched.

***Harm to the Company***

169. As a direct and proximate result of the Individual Defendants' misconduct, Cogent has lost and expended, and will lose and expend, millions of dollars.

170. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Schaeffer and Weed and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

172. Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

173. As a direct and proximate result of the Individual Defendants' conduct, Cogent has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

174. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

175. Cogent is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

176. Plaintiff is a current shareholder of Cogent and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

177. A pre-suit demand on the Board of Cogent is futile and, therefore, excused. At the time this action was commenced, the eight-member Board consisted of Individual Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

178. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

179. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

180. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their

recurrence.

181. Defendant Schaeffer is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Schaeffer founded the Company and serves as the Company's President and CEO. Thus, as conceded by the Company in the 2026 Proxy, Defendant Schaeffer is a non-independent director. Moreover, as detailed above, through his personal pledging activities, Defendant Schaeffer's personal financial success was highly dependent on the success of Cogent and the price of its stock. Furthermore, Defendant Schaeffer is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

182. Director Defendants Schaeffer, Ferguson, and Kennedy are also Insider Selling Defendants and used their knowledge of Cogent's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Cogent, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. Defendant Schaeffer sold over 3.3 million shares of his personally held Cogent stock for proceeds of over $121.3 million. Defendant Ferguson sold over 12,000 shares of his personally held Cogent stock for proceeds of approximately $550,329. Defendant Kennedy sold over 10,000 shares of her personally held Cogent stock for proceeds of approximately $398,527. Accordingly, demand is futile as to Schaeffer, Ferguson, and Kennedy.

183. Defendants Brooks, Ferguson, and Kennedy (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial

reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

184. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

185. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

186. Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

187. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the

Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

188. The acts complained of herein constitute violations of fiduciary duties owed by Cogent's officers and directors, and these acts are incapable of ratification.

189. Thus, for all of the reasons set forth above, the Director Defendants are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

190. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

192. Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

193. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

194. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, 2025 Proxy, and 2026 Proxy (collectively, the "Proxy Statements"), which were filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because they failed to disclose, *inter alia*, that the Individual Defendants were failing in their oversight duties and allowed the Company to operate with inadequate internal controls, which resulted in the failure to prevent the Individual Defendants from causing the Company to make materially false and misleading statements concerning Cogent during the Relevant Period.

195. The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Schaeffer, Montagner, Bath, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

196. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically,

the materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

197. The misrepresentations and omissions in the 2026 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2026 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2026 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

198. As a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements, the Company has sustained significant damages.

199. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT II**

**Against Defendants Schaeffer and Weed for Contribution Under Sections 10(b) and 21D of the Exchange Act**

200. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201. Cogent and Defendants Schaeffer and Weed are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the

federal securities laws, the Company's liability will be in whole or in part due to Defendants Schaeffer's and Weed's willful and reckless violations of their obligations as officers and directors of the Company.

202. Defendants Schaeffer and Weed, because of their positions of control and authority as officers and directors of the Company, were able to and did, directly or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

203. Accordingly, Defendants Schaeffer and Weed are liable under 15 U.S.C. §78j(b), which creates a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

204. As such, Cogent is entitled to receive all appropriate contribution or indemnification from Defendants Schaeffer and Weed.

205. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
### For Breach of Fiduciary Duty

206. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

208. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, oversight, and supervision.

209. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

210. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) a substantial portion of its backlog for optical wavelengths was unlikely to become paying customer revenue; (ii) customer demand was weaker than what was being represented; (iii) the Company's wavelength business was not performing at the levels necessary to support Cogent's reported financial targets; (iv) as a result of the foregoing, the Company's dividend policy was unsustainable; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

211. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though

such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

212. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

213. Moreover, in further breach of fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase its own common stock at artificially inflated prices before the fraud was exposed.

214. The Insider Selling Defendants breached their duty of loyalty by selling Cogent stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Cogent common stock.

215. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

216. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

217. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

218. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

219. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cogent.

220. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Cogent that was tied to the performance or artificially inflated valuation of Cogent or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

221. Plaintiff, as a shareholder and a representative of Cogent, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants, including gains from illegal insider sales, due to their wrongful conduct and breach of their fiduciary and contractual duties.

222. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

223. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

224. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

225. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

226. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

227. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Cogent to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Cogent and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure

controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: October 26, 2026

**SUTTER & TERPAK, PLLC**

By: */s/ Matthew T. Sutter*
Matthew T. Sutter, DC Bar 477910
7540 Little River Turnpike, Suite A
Annandale, Virginia 22003
Telephone: (703) 256-1800
Facsimile: (703) 991-6116
Email: matt@sutterterpak.com

*Local Counsel for Plaintiff*

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085